RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED _____
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE _4-21-05_ _____

## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
LAURA ALLEN, ADMINISTRATRIX OF                        :
THE ESTATE OF THE LATE DANIEL                         :
ALLEN, TIMOTHY BRIDGES, and ALFRED                    :
MORABITO, individually and on behalf of               :
themselves and all others similarly situated,         :
                                                      :
                    Plaintiffs,                       :        No. _____
                                                      :
                                                      :
                 - against -                          :
                                                      :
                                                      :
PFIZER, INC. and PARKE-DAVIS, a division              :
of Warner-Lambert Company,                            :
                                                      
                    Defendants.                       
                                                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

# 05 - 10797 PBS

MAGISTRATE JUDGE _Bowler_

## NOTICE OF REMOVAL

TO:    THE JUDGES OF THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF MASSACHUSETTS

Defendants Pfizer Inc. and Parke-Davis, a division of Warner-Lambert Company, (together the defendants) by and through their counsel, hereby give notice of removal of this case to this Honorable Court from Superior Court of the Commonwealth of Massachusetts. This case relates to the sales and marketing practices of the prescription drug Neurontin. The defendants therefore ask that this case be assigned to Judge Saris, before whom is currently pending In re Neurontin Sales and Marketing Practices, MDL No. 1629 (D. Mass.). In support of this Petition, the defendants assert as follows:

## BACKGROUND

1.    On March 21, 2005, the plaintiffs filed a complaint in this putative class action with the Superior Court of the Commonwealth of Massachusetts, entitled Laura

Allen, Administratrix of the Estate of the late Daniel Allen, Timothy Bridges, and Alfred

Morabito, individually and on behalf of themselves and all others similarly situated v.

Pfizer, Inc. and Parke-Davis, a division of Warner-Lambert Company. A copy of this

complaint is attached to this Notice.

2.    The plaintiffs served this complaint on defendant Pfizer Inc. on March 22,

2005.

3.    The plaintiffs had previously filed a complaint in the Superior Court of the

Commonwealth of Massachusetts, on December 23, 2004, but the plaintiffs never served

the defendants with this complaint. See Mass. Rule of Civ. P. 4(j) ("If a service of the

summons and complaint is not made on the defendant within 90 days after the filing of

the complaint . . . the action shall be dismissed").

4.    According to the operative complaint filed and served on defendants, the

plaintiffs bring this action pursuant to Massachusetts's unfair and deceptive practices

statute, Mass. Gen. Laws ch. 93A, §§ 2 and 9, and Massachusetts Rule of Civil Procedure

23 on behalf of "[a]ll Massachusetts residents who . . . purchased . . . the prescription

medication, Neurontin, after being prescribed [Neurontin] for Bipolar Disorder;

Peripheral Neuropathy, Diabetic Neuropathy and other pains [sic] syndromes; Epilepsy

Monotherapy; Reflex Sympathetic Dystrophy; Attention Deficit Disorder; Restless Leg

Syndrome; Trigeminal Neuralgia; Essential Tremor Periodic Limb Movement Disorder;

migraines; Amyotrophic Lateral Sclerosis; and drug and alcohol withdrawal seizures

during the period from January 1, 1994 to the present." Compl., ¶ 21.

5.    Massachusetts Rule of Civil Procedure 23 is similar to Federal Rule of

Civil Procedure 23. See 28 U.S.C. § 1332(d)(1)(B).

6.    This Notice of Removal is timely filed within thirty days of defendants' service of the complaint.  28 U.S.C. § 1446(b).

7.    Pursuant to 28 U.S.C. § 1446(d), the defendants shall file a copy of this Notice of Removal with the Clerk of the Superior Court of the Commonwealth of Massachusetts.  The defendants have also served the plaintiffs with a copy of this Notice of Removal.

## JURISDICTION

8.    This Court has original jurisdiction over this putative class action pursuant to 28 U.S.C. § 1332(d)(2)(A), as provided for by the Class Action Fairness Act of 2005, Pub. L. No. 109-2, 119 Stat. 4 (codified in scattered sections of 28 U.S.C.) (the "Class Action Fairness Act" or "the Act"), because: (1) the amount in controversy exceeds $5,000,000, exclusive of interest and costs, (2) a member of the putative class of plaintiffs is a citizen of a state that is different from the states of citizenship of the defendants, and (3) the putative class action consists of at least 100 proposed class members.

9.    The jurisdictional provisions of the Class Action Fairness Act "apply to any civil action commenced on or after" February 18, 2005, the date the law was enacted. See 119 Stat. at 4, 14.  Whether the date of commencement is determined by when the complaint was filed in state court or when the action was removed to federal court, the Act applies here.

10.    With respect to the date of filing in state court, the civil action was commenced after February 18, 2005 because the operative complaint in this action was

3

not filed until March 21, 2005 and was not served on the defendants until March 22, 2005, well after the Act's effective date.

11.     To the extent this Court concludes that a civil action is commenced on the date the action is removed and filed in federal court (which we believe to be the correct view of the law), that date also occurred after the Act's effective date.

12.     Moreover, construction of the Act's jurisdictional provisions to provide for federal jurisdiction over this action furthers the express purpose of the Act: to allow "for Federal court consideration of interstate cases of national importance under diversity jurisdiction." P.L. 109-2, § 2(b)(2); see also S. Rep. 108-123 at 45 (noting that the purpose of the Act is to "encourage the exercise of federal jurisdiction over class actions").

## Amount in Controversy

13.     According to the Complaint, "[t]he total number of [putative] Class members" – for the putative class period that runs from 1994 to the present – "is in the tens of thousands." Compl., ¶ 24.

14.     According to the Complaint, the plaintiffs and putative class members each "purchased the drug" and "thereby suffered economic loss." Id. at ¶ 13.

15.     According to the Complaint, the plaintiffs and putative class members seek to "be awarded double or treble damages." Id. at 41 (Prayer for Relief at D).

16.     According to the Complaint, the defendants' "revenue from the sale of Neurontin was $97.5 million [in 1995]; by 1997, sales increased to $292 million; by 1999, sales increased to $913 million; by 2000, sales increased to $1.3 billion; and by 2003, sales were nearly $2.7 billion." Id. at ¶ 316.

4

17.    According to the Complaint, "sales of Neurontin [for] scientifically unproven uses have steadily increased since 1998, and from 2000 to the present have consistently remained at 93% to 94% of all sales." Id. at ¶ 225.

18.    According to the Complaint, the plaintiffs and putative class members also seek attorneys' fees. Id. at 41 (Prayer for Relief at F).

19.    The plaintiffs and putative class members also seek "other relief as [the court] may deem just and equitable." Id. at 41 (Prayer for Relief at G).

20.    If awarded, the aggregate damages and other relief sought and described by the plaintiffs in this action are likely to exceed $5,000,000, exclusive of interest and costs. See 28 U.S.C. § 1332(d)(6).

**Citizenship of Parties**

21.    According to the Complaint, "[e]ach plaintiff and proposed class representative is a . . . resident of the Commonwealth of Massachusetts." Compl., ¶ 12.

22.    In the Complaint, the plaintiffs describe Defendant Pfizer Inc. as "a Delaware corporation with a principal place of business in New York, New York." Id. at ¶ 15.

23.    Defendant Pfizer Inc. is in fact a corporation existing under the laws of the State of Delaware and has its headquarters in the State of New York. See 28 U.S.C. § 1332(c)(1). Pfizer Inc. therefore is not a citizen of Massachusetts for purposes of diversity jurisdiction.

24.    In the Complaint, the plaintiffs describe Defendant "Parke-Davis, a division of Warner-Lambert Company" as "headquartered in Ann Arbor, Michigan." Compl., ¶ 16.

25.    The plaintiffs allege that Pfizer Inc. acquired Warner-Lambert Company in 2000. Id.

26.    The Complaint alleges that "all liabilities" are Pfizer's responsibility and thus, to the extent it is a defendant, Parke-Davis is a nominal defendant, which is disregarded for removal purposes. Id.

27.    To the extent that Parke-Davis is other than a nominal defendant, Parke-Davis is an unincorporated division of Warner-Lambert Company, LLC and is not a separate corporation or other legal entity. Warner-Lambert Company, LLC was at the time of filing this action, and still is, a limited liability company whose sole shareholder is Pfizer Inc.

28.    Limited liability companies are citizens of the states of which their individual shareholders are citizens or, under the Act, the states where they have their principal place of business and where they are organized. See 28 U.S.C. § 1332(d)(10). Accordingly, Warner-Lambert Company, LLC, like Pfizer Inc., is not a citizen of Massachusetts.

## CONCLUSION

29.    This case is removable pursuant to 28 U.S.C. §§ 1441(b), 1453(b), and 1332(d)(2)(A) because the aggregate amount in controversy exceeds S5,000,000, exclusive of interest and costs, and a plaintiff is a citizen of a state different from defendant Pfizer Inc.

30.    Written notice of the filing of this Notice will be given to counsel for the plaintiffs and notice will be promptly filed with the Superior Court of the Commonwealth of Massachusetts.

6

WHEREFORE, the defendants respectfully request the above-captioned action now pending against it in the Superior Court of the Commonwealth of Massachusetts, be removed to this Court.

Dated:  April 20, 2005

DEFENDANTS PFIZER INC. and
PARKE-DAVIS, a DIVISION of
WARNER-LAMBERT COMPANY,

By their attorneys,

David B. Chaffin
BBO No. 549245
Hare & Chaffin
160 Federal Street, 23rd Floor
Boston, MA 02110
(617) 330-5000

*Of Counsel:*
James P. Rouhandeh, Esq.
James E. Murray, Esq.
Davis Polk & Wardwell
450 Lexington Avenue
New York, NY 10017
(212) 450-4000



7

## COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT

LAURA ALLEN, ADMINISTRATIX )
OF THE ESTATE OF THE LATE )
DANIEL ALLEN, TIMOTHY BRIDGES, )
and ALFRED MORABITO, individually )
and on behalf of themselves and all others )
similarly situated, )
                         )
           Plaintiffs, )
                         )
v.                         )
                         )
PFIZER, INC. and PARKE-DAVIS, )
a division of Warner-Lambert Company )
                         )
           Defendants. )
                         )

CIVIL ACTION NO. 04-5600 BLS

## FIRST AMENDED CLASS ACTION COMPLAINT

### I. NATURE OF THE ACTION

1.     Plaintiffs by and through their undersigned attorneys, bring this strictly
state law cause of action on behalf of themselves and all similarly situated consumers as
a result of Defendants' unfair and deceptive scheme designed to push and promote the
prescription drug Neurontin for fraudulently devised uses that were not scientifically
proven to be safe, efficacious, effective or useful.

2.     Defendants' scheme involved a deliberate and deceitful marketing and
sales campaign, ultimately designed to dupe Massachusetts consumers into believing that
taking Neurontin for Bipolar Disorder; Perhipheral Neuropathy, Diabetic Neuropathy and
other pains syndromes; Epilepsy Monotherapy; Reflex Sympathetic Dystrophy; Attention
Deficit Disorder; Restless Leg Syndrome; Trigeminal Neuralgia; Essential Tremor
Periodic Limb Movement Disorder; migraines; Amyotrophic Lateral Sclerosis (Lou
Gehrig's Disease); and drug and alcohol withdrawal seizures (herein collectively referred

Estate of the late Daniel Allen, is a resident of the Commonwealth of Massachusetts whose late husband was prescribed Neurontin during the Class Period for the treatment of pain, migraine headaches, loss of strength and energy and Amyotrophic Lateral Sclerosis. As a result of Defendants unfair and deceptive acts, Plaintiff has been injured and has suffered actual damages.

10.     Plaintiff and proposed class representative, Timothy Bridges, is a resident of the Commonwealth of Massachusetts who was prescribed Neurontin during the Class Period for treatment after two back surgeries for among other uses: pain syndrome and nerve pain. As a result of Defendants unfair and deceptive acts, Plaintiff has been injured and has suffered actual damages.

11.     Plaintiff and proposed class representative, Alfred Morabito, is a resident of the Commonwealth of Massachusetts who was prescribed Neurontin during the Class Period for treatment after a shoulder injury for among other uses: pain, arthritis, tremors and fibromyalgia. As a result of Defendants unfair and deceptive acts, Plaintiff has been injured and has suffered actual damages.

12.     Each Plaintiff and proposed class representative is a natural person and resident of the Commonwealth of Massachusetts who was prescribed Neurontin for a scientifically unproven use unfairly and deceptively promoted by the Defendants.

13.     Each Plaintiff purchased the drug for their own use and not for resale and thereby suffered economic loss as described herein. Each Plaintiff and Class member has been injured and is entitled to actual and/or statutory damages recognized by G.L. c. 93A as a direct result of Defendants' willful and knowing unfair or deceptive acts or practices.

14.     Each putative class representative and class member was subjected to the same unfair or deceptive acts or practices of the Defendants in that the Defendants misrepresented

3

material scientific, medical and clinical information related to the safety, medical efficacy, effectiveness and usefulness of Neurontin during the Class Period.

15.    Defendant Pfizer, Inc. ("Pfizer") is a Delaware corporation with a principal place of business in New York, New York. Pfizer is principally engaged in the manufacture and sale of pharmaceuticals and is one of the largest pharmaceutical companies in the United States. Pfizer maintains facilities and offices throughout the United States, including a research technology center located at 620 Memorial Drive, Cambridge, Massachusetts.

16.    Defendant Parke-Davis, a division of Warner-Lambert Company, ("Parke-Davis") is headquartered in Ann Arbor, Michigan. In 2000, Pfizer acquired Warner-Lambert Company ("Warner-Lambert") including Warner-Lambert's Parke-Davis division. As a result of the acquisition, Pfizer is responsible for all liabilities that result from any acts or omissions of Parke-Davis or Warner-Lambert that occurred prior to the Warner-Lambert acquisition. At times throughout this Complaint, Parke-Davis and Pfizer may be referred to collectively as "Pfizer" or "Defendants."

## III.    JURISDICTION AND VENUE

17.    Without limiting the generality of the foregoing, Defendants (directly or through agents who at the time were acting with actual and/or apparent authority and within the scope of such authority) have:

  a)    Transacted business in this Commonwealth;

  b)    Contracted to supply and/or obtain services and/or goods in this Commonwealth;

  c)    Intentionally availed themselves of the benefits of doing business in this Commonwealth;

  d)    Produced, promoted, sold, marketed and/or distributed their products and/or services in this Commonwealth and, thereby, have purposefully profited from their access to this Commonwealth's markets;

  e)    Caused tortious damage by act or omission in this Commonwealth;

4

f)    Caused tortious damage in this Commonwealth by act or omission committed outside this Commonwealth while: (i) regularly doing or soliciting business in this Commonwealth; and/or, (ii) engaging in other persistent courses of conduct within this Commonwealth; and/or, (iii) deriving substantial revenue from goods used or consumed or services rendered in this Commonwealth;

g)    Committed acts and omissions which Defendants knew or should have known would cause damage (and, in fact, did cause damage) in this Commonwealth to Plaintiffs and members of the Class (as defined herein) while: (i) regularly doing or soliciting business in this Commonwealth; and/or, (ii) engaging in other persistent courses of conduct within this Commonwealth; and/or (iii) deriving substantial revenue from goods used or consumed or services rendered in this Commonwealth; and/or,

h)    Otherwise had the requisite minimum contacts with this Commonwealth, such that under the circumstances it is fair and reasonable to require Defendants to come to this Court to defend this action.

18.    Venue is proper because at least one Plaintiff resides in this County and Defendants conduct business in this County, including the marketing, advertising and sales directed at Massachusetts residents.

19.    Neither the putative class representatives nor any member of the Class has damages exceeding $75,000 each even when trebled. Named plaintiffs expressly disclaim any individual recovery equal to or in excess of $75,000. Attorneys' fees on a pro-rata basis will not exceed $75,000 for each class member.

20.    Plaintiffs state and intend to state, a cause of action solely under the laws of Massachusetts and specifically deny any attempt to state a federal question and/or cause of action under the laws of the United States of America. Moreover, Plaintiffs' state law claim is not federally preempted. The claim is purely based on state law (G.L. c. 93A) and relies exclusively on state law. The claim advanced mandates that this action be heard in a Massachusetts state forum.

## IV.  CLASS ACTION ALLEGATIONS

21.    Plaintiffs bring this action on their own behalf and, pursuant to G.L. c. 93A,

§9(2) and/or Rule 23 of the Massachusetts Rules of Civil Procedure on behalf of all members of the following class (the "Class") defined as:

> All Massachusetts residents who, within the Commonwealth of Massachusetts purchased for non-commercial and/or consumer purposes the prescription medication, Neurontin, after being prescribed said medication for Bipolar Disorder; Perhipheral Neuropathy, Diabetic Neuropathy and other pains syndromes; Epilepsy Monotherapy; Reflex Sympathetic Dystrophy; Attention Deficit Disorder; Restless Leg Syndrome; Trigeminal Neuralgia; Essential Tremor Periodic Limb Movement Disorder; migraines; Amyotrophic Lateral Sclerosis; and drug and alcohol withdrawal seizures during the period from January 1, 1994 to the present (the "Class Period").

22.    Excluded from the Class are all claims for personal injury or wrongful death.

23.    Excluded from the Class are employees of governmental entities, defendants, subsidiaries and affiliates of defendants.

24.    The total number of Class members is in the tens of thousands, and therefore joinder of all members of the Class would be impracticable. The disposition of the claims of the Class members in a single class action will provide substantial benefits to all parties and to the Court.

25.    There are questions of law and fact common to the Class which predominate over questions affecting only individual class members, including, but not limited to:

a)    Whether Defendants knew or should have known that Neurontin was not safe, efficacious, effective and useful for certain scientifically unsupported uses;

b)    Whether Defendants intentionally misrepresented the scientific, medical, and clinical data related to the safety, efficacy, effectiveness and usefulness of Neurontin for unproven medical conditions in violation of G.L. c. 93A;

c)    Whether Defendants intentionally misrepresented the scientific, medical, and clinical data related to the safety, efficacy, effectiveness and usefulness of Neurontin in greater doses than scientifically proven in violation of G.L. c. 93A;

d)    Whether Defendants developed and carried out a uniform pattern of conduct ultimately designed to dupe consumers into believing the scientifically unproven uses promoted by Defendants were safe, efficacious, effective and useful in violation of G.L. c. 93A;

6

e)   Whether Defendants knowingly created, publicized and disseminated articles, reports and studies misrepresenting the scientific credibility of data and authors of such articles, reports and studies in violation of G.L. c. 93A;

f)   Whether Defendants deliberately misrepresented the credentials and qualifications of certain employees as purported specialists, researchers or physicians in order to market and sell Neurontin for scientifically unproven uses in violation of G.L. c. 93A;

g)   Whether Defendants organized seminars and encouraged physicians to prescribe Neurontin for uses not proven to be safe, efficacious, effective or useful in violation of G.L. c. 93A;

h)   Whether Defendants intentionally misrepresented and concealed their role and participation in the creation and sponsorship of seminars, events, articles and publications aimed at selling Neurontin for medical conditions in violation of G.L. c. 93A;

i)   Whether Defendants intentionally made false statements to physicians and pharmacists concerning the safety, efficacy, effectiveness and usefulness of Neurontin in violation of G.L. c. 93A;

j)   Whether the Plaintiffs and the other members of the Class were injured by Defendants' course of conduct and, if so, the appropriate class-wide measure of damages;

k)   Whether Defendants willfully and knowingly deceived the members of the Class as described herein:

l)   Whether Defendants knew the representations they made as alleged herein were false at the time they made them;

m)   Whether Defendants' acts or practices in marketing Neurontin to treat a variety of symptoms for which Neurontin was not proven to be safe, efficacious, effective or useful were unfair or deceptive;

n)   Whether Defendants' unfair or deceptive acts or practices in marketing Neurontin for scientifically unproven uses were knowing and willful violations of G.L. c. 93A entitling Plaintiffs and members of the Class to double or treble damages; and

o)   Whether Defendants failure to tender a reasonable settlement offer to a Class of persons that suffered monetary losses and other injury as a result of conduct that they had reason to know violated G.L. c. 93A supports a claim for treble damages.

26.   These and other questions of Massachusetts law and fact are common to the Class and predominate over any question affecting only individual members of the Class.

27. The claims of the representative Plaintiffs are typical of the claims of the Class because they, like all Class members, have purchased Neurontin in Massachusetts for scientifically unproven uses and have been harmed by Defendants' misconduct because they would not have purchased Neurontin had they known the truth.

28. The factual and legal bases of Defendants' misconduct are common to all Class members and represent a common thread of deception and other misconduct resulting in injury to Plaintiffs and all members of the Class.

29. The Plaintiffs are members of the Class and will fairly and adequately represent the interests of the Class.

30. The Plaintiffs have no conflicts with, or interests antagonistic to, other members of the Class.

31. The Plaintiffs have retained counsel with substantial experience in prosecuting class action and consumer protection litigation.

32. The Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class, and have the financial resources to do so.

33. Defendants have acted and failed to act on grounds generally applicable to Plaintiffs and the Massachusetts Class and require Court imposition of relief as to the Class as a whole.

34. This class action is superior to any alternatives for the fair and efficient adjudication of this controversy because:

    a) It will avoid a multiplicity of suits and consequent burden on the courts and parties;

    b) It would be virtually impossible for all Class members to intervene as parties-Plaintiffs in this action;

c) It will allow numerous individuals with claims too small to adjudicate on an individual basis because of the prohibitive cost of this litigation, to obtain redress for their economic injuries;

d) A class action is appropriate for treatment on a fluid recovery basis, which will obviate any manageability problems; and

e) It will provide court oversight of the claims process, once Defendants' liability is adjudicated.

## V.  FACTUAL ALLEGATIONS

### A.    Defendants Knew That Market For Neurontin Was Limited

35.    At all times during the Class Period, Parke-Davis was principally engaged in the manufacture and sale of pharmaceuticals.

36.    Pfizer acquired Warner-Lambert including its Parke-Davis Division in 2000.

37.    Pfizer currently markets and sells Neurontin, a brand name prescription drug composed of the chemical compound (1-aminomethyl)-1-cyclohexaneacetic acid, generically known as gabapentin.

38.    In 1993, Defendants knew that the market for adjunctive therapy for epilepsy was small with a population potential of approximately two million patients.

39.    In May 1994, Defendants estimated that Neurontin's ultimate sales potential was only $500 million over the lifetime of the drug.

40.    The market for the other uses of Neurontin as alleged herein (pain management, psychiatric disorders, anxiety and depression, etc) represented considerably larger markets individually and jointly.

41.    Defendants had knowledge prior to making scientifically unproven and unsupported representations as to Neurontin's safety, efficacy, effectiveness and usefulness as set forth herein, that if these markets could be tapped, they could enjoy enormous profits from Neurontin.

9

B.     **Defendants Intentionally Decided to Promote Neurontin For Unproven Uses Through Publication of False and Misleading Scientific, Medical and Clinical Data**

42.     In January 1995, Parke-Davis's Marketing and Planning Department presented a preliminary Market analysis to the Neurontin Development Team for Neurontin's use for psychiatric indications.

43.     Without considering whether Neurontin could be proven to be safe, efficacious, effective or useful, the report indicated that such a market for Neurontin would be profitable.

44.     The possibility of unfairly and deceptively expanding the market for Neurontin's use for pain syndromes, another market larger than epilepsy, was also discussed.

45.     In February 1995, despite lacking scientific and medical data, the New Product Committee informed the Neurontin Development Team that it supported the development of Neurontin for other uses.

46.     A market feasibility analyses of potential new uses, including bipolar disorder, generalized anxiety disorder, social phobia, neuropathic pain and migraine prophylaxis was prepared.

47.     By March 1995, Parke-Davis recognized it would be uneconomical to assume the expense and time necessary to conduct clinical trials to prove that Neurontin was safe and effective for these uses.

48.     The difficulty and expense in conducting medical and clinical studies in order to demonstrate whether the drug was safe and effective for these uses was not sufficiently profitable.

49.     Instead, Defendants' officials developed a strategy that would allow Defendants to avoid the costs of proving that Neurontin was safe and effective for these

50.    As one aspect of the scheme, Defendants knowingly and willfully chose to employ a "publication strategy".

C.    **Unfair and Deceptive "Publication Strategy"**

51.    With a short period of patent protection for Neurontin, Parke-Davis chose to immediately implement unfair and deceptive practices to persuade consumers to use Neurontin for scientifically unproven uses.

52.    On March 22, 1995, the Parke-Davis Marketing Council met in Lyons, France and recommended that Parke-Davis pursue a "publication strategy" with regard to psychiatric indications for Neurontin.

53.    The "publication strategy" promoted Neurontin though the massive distribution of related publications.

54.    The publications were misrepresented as written by independent researchers.

55.    The publications were misrepresented as describing scientifically valid evaluations of Neurontin.

56.    This unfair and deceptive strategy was advantageous to Defendants, because it could be employed immediately.

57.    By publishing non-scientifically valid studies, Defendants unfairly and deceptively avoided the cost and time delay necessary to obtain the results of scientifically conducted clinical trials to determine if Neurontin was actually effective in the treatment of the subject conditions.

58.    The unfair and deceptive marketing scheme also consisted of an elaborate and clandestine promotion of Neurontin for scientifically unproven uses such as bipolar disorder, neuropathic pain, monotherapy for seizures, bipolar disorders and attention

deficit disorder.

59.    The representations about the uses of Neurontin for pain control, monotherapy for seizures using extremely high doses, control of bipolar disorder, and attention deficit disorder, were known to be false to the Defendants and were intended to deceive the members of the Class.

60.    A Parke-Davis internal memo dated May 5, 1997 posed the central question: Whether it made sense for Parke-Davis do to do rigorous and expensive trials to prove that Neurontin worked for the burning, tingling pain of diabetic neuropathy? The memo's answer: "It did not."

61.    The Parke-Davis memo further pointed out there were up to 16 million diabetics in the country while the market for Neurontin's use for epileptic seizures, had a market of two million.

62.    The Epilepsy marketing team recommended that Defendants skip the clinical studies (that would show whether or not Neurontin was safe, efficacious, effective or useful) and immediately promote Neurontin for pain.

**D.    Creation of Elaborate Plan to Implement Publication Strategy**

63.    In order to implement the publication strategy, Parke-Davis created an elaborate marketing and sales plan. The deceptive plan included, *inter alia*: (a) deliberately misrepresenting the scientific, medical and clinical date that related to the safety, medical efficacy, effectiveness and usefulness of Neurontin for scientifically unproven uses; (b) deliberately misrepresenting the credentials and qualifications of certain of Defendants' employees as purported specialists, medical researchers, physicians and scientific employees in order to market and sell Neurontin for scientifically unproven uses; (c) knowingly publishing articles, studies and reports misrepresenting the scientific credibility of data and the authors of articles, studies and

reports; (d) organizing seminars and events designed to encourage unsuspecting physicians to prescribe Neurontin for uses knowing such uses were not proven to be safe, medically efficacious, effective or useful and (e) intentionally misrepresenting and concealing Defendants' role and participation in the creation and sponsorship of a variety of seminars, events, articles and publications aimed to sell Neurontin for unproven uses.

64.    The unfair and deceptive plan required the cooperation of a number of marketing firms ("vendor participants") and several dozen physicians ("physician participants").

65.    The acts of the plan centered on the vendor participants such as Cline, Davis & Mann, Inc. (Proworx); Thompson Physicians World; Sudler & Hennessey; MEDED; MES Healthcare Communications Group; and AMM/Adelphi, organizing and hosting numerous seminars and events over the course of several years that were falsely represented to be neutral, educational forums.

66.    At these events, Defendants paid participants to provide misleading and deceptive information to physicians on scientifically unproven uses of Neurontin. The participants were not independent, but received coaching and remuneration from the vendor participants and Defendants.

67.    Defendants also caused numerous articles and promotional pieces to be published in medical literature disseminated in Massachusetts misrepresenting the safety, efficacy, effectiveness and usefulness of Neurontin to treat conditions that lacked scientific, medical and clinical data.

68.    Defendants unfairly and deceptively hired and directed non-physician technical writers to write purported medical articles, with input and direction from Defendants and the vendor participants.

69.    Neither Defendants nor the vendor participants wanted their names on the

articles so they secretly paid physician participants for use of their names as authors; otherwise known as ghostwriting.

70.    The use of physician signators gave the false impression that the articles were unbiased and not sponsored by Defendants and written by medical doctors according to medically accepted practices and protocols.

71.    In order to monitor and coordinate the ghostwriting plan, Defendants hired marketing firms.

72.    Defendants deceptively trained so called medical liaisons – unqualified technical employees of Defendants who were supposed to provide balanced scientific evidence to physicians.

73.    Defendants trained the medical liaisons to unfairly and deceptively engage in full scale promotion of Neurontin's unproven uses, with the use of non-scientific, anecdotal information designed to convince physicians to prescribe Neurontin for unproven uses.

74.    The medical liaisons misrepresented themselves as medical researchers and specialists even though they never conducted medical research nor analyzed medical research performed by others.

75.    Defendants had knowledge that it was unfair and deceptive to promote Neurontin for scientifically unproven uses.

76.    Despite actual knowledge that they could not promote Neurontin lawfully for scientifically unproven uses, marketing executives at Defendants' headquarters in Morris Plains, New Jersey, and in its five regional customer business units (CBUs), knowingly and willfully chose a marketing strategy that by design would lead to increased usage of Neurontin for scientifically unproven uses.

77.    Throughout the Class Period, the Defendants' executives had actual

ledge that Defendants' creation of the contents of communications that would be distributed pursuant to the "publication strategy" were unfair and deceptive.

78.     Throughout the Class Period, Defendants' executives had actual knowledge that Defendants were not supposed to design the contents of the communications that would be distributed pursuant to the "publication strategy."

79.     Throughout the Class Period, Defendants' executives had actual knowledge that Defendants were not supposed to do anything to generate the practicing physicians' interest in receiving such communications.

80.     Instead, Defendants put into effect the pervasive pattern of illegal, unfair or deceptive conduct described below.

81.     While the Defendants actively carried out the unfair and deceptive marketing plan from at least 1994 through 2000, the effects of their wrongful activity continue through to the present time as doctors continue to prescribe Neurontin for scientifically unproven uses lacking any scientific or medical data.

**E.     Unfair And Deceptive Representations as To Safety, Efficacy, Effectiveness And Usefulness of Neurontin**

82.     Extensive willful and knowing misrepresentations designed to deceive consumers were made about the scientific information supporting uses of Neurontin.

83.     The following knowing and willful misrepresentations designed to deceive relating to unproven uses of Neurontin were ultimately made to consumers with the knowledge and consent of Defendants' marketing personnel, and continued to be made after the 2000 merger with Pfizer:

> a)     *Bipolar Disorder.*  Medical liaisons informed psychiatrists that early results from clinical trials evaluating Neurontin for the treatment of bipolar disorder indicated a ninety percent (90%) response rate when Neurontin was started at 900 mg/day dosage and increased to a dosage of 4800 mg/day. No such results existed. Nor was any type of clinical trial

being conducted other than a pilot study. There were no clinical trials or studies indicating that Neurontin was safe or effective up to 4800 mg/day. Indeed, Defendants were in possession of clinical trial evidence, which showed that there was no dose response difference between patients who received 600 mg/day, 1200 mg/day and 2400 mg/day. Any data relating to the use of Neurontin in bipolar disorder was strictly anecdotal and of nominal scientific value. Indeed, most of the published reports on this topic had been written and commercially sponsored by Defendants, although this fact was hidden. Medical liaisons were trained to inform psychiatrists that there were 110 reports of adverse effects for Neurontin when used for psychiatric purposes. In fact, such reports had been reported to Defendants' personnel, but Defendants attempted to hide such reports from Massachusetts physicians.

b)      *Peripheral Neuropathy, Diabetic Neuropathy, and Other Pain Syndromes.* Medical liaisons were trained and instructed to report that "leaks" from clinical trials demonstrated that Neurontin was highly effective in the treatment of various pain syndromes and that a ninety percent (90%) response rate in the treatment of pain was being reported. No such body of evidence existed. Nor was there any legitimate pool of data from which a response rate, much less a ninety percent (90%) response rate, could be calculated. Medical liaisons were trained to claim support for these findings as a result of inside information about clinical trials where no such information existed. The only support for these claims was anecdotal evidence with no scientific value. Many of the published case reports had been created and/or sponsored by Defendants in articles which frequently hid Defendants' involvement in the creation of the article. Defendants' payment for the creation of these case reports were also hidden from Massachusetts physicians.

c)      *Epilepsy Monotherapy.* Medical liaisons were strongly encouraged to push Massachusetts neurologists to prescribe Neurontin as the sole medication to treat epilepsy, even though studies only found it safe and effective as adjunctive therapy. Medical liaisons were trained to inform neurologists that substantial evidence supported Defendants claim that Neurontin was effective as monotherapy. In fact, at this time, Defendants knew that clinical trials regarding Neurontin's efficacy as a monotherapy were inconclusive. One of Defendants' clinical trials, 945-82, demonstrated that Neurontin was not an effective monotherapy agent; the vast majority of patients in the study taking Neurontin were unable to continue with Neurontin alone. The same study showed that there was no effective difference between administrations of Neurontin at 600, 1200 or 2400 mg. Notwithstanding this data, Defendants continued to claim that physicians should use Neurontin at substantially higher doses than indicated by the labeling.

d)      *Reflex Sympathetic Dystrophy ("RSD").* Medical liaisons informed Massachusetts physicians that extensive evidence demonstrated the efficacy of Neurontin in the treatment of RSD. The only such evidence that existed was anecdotal reports with no scientific value. Medical liaisons were trained to refer to case reports, most of which had been created or sponsored by Defendants, as "studies."

16

e)     *Attention Deficit Disorder ("ADD")*.  Medical liaisons were instructed to inform Massachusetts pediatricians that Neurontin was effective for the treatment of ADD.  No data, other than occasional anecdotal evidence, supported this claim.  Nonetheless, the medical liaisons were trained to report that large number of physicians had success-treating ADD with Neurontin, when no such case reports existed.

f)     *Restless Leg Syndrome ("RLS")*.  RLS was another condition where Defendants' "medical liaisons" were trained to refer to a growing body of data relating to the condition, when no scientific data existed.  The only reports were anecdotal, most of which had been created and/or controlled by Defendants.

g)     *Trigeminal Neuralgia*.  Although medical liaisons represented that Neurontin could treat Trigeminal Neuralgia, once again no scientific data supported this claim with the exception of occasional anecdotal reports.  No data demonstrated that Neurontin was as effective as currently available painkillers, most of which were inexpensive.

h)     *Essential Tremor Periodic Limb Movement Disorder ("ETPLMD")*.  Medical liaisons were trained to allege that Neurontin was effective in the treatment of these conditions.  Any data relating to the treatment of ETPLMD was purely anecdotal and with no scientific value.

i)     *Migraine*.  Claims that Neurontin was effective in the treatment of migraine headaches were made by the medical liaisons and were supposedly based on early results from clinical trials.  Although pilot studies had been suggested and undertaken, no early results of clinical trials existed to support these claims.  Once again, any data relating to treatment of migraines was purely anecdotal and with no scientific value.  Most of the case reports were either created or controlled by Defendants.

j)     *Amyotrophic Lateral Sclerosis*.  Claims that Neurontin was effective for treatment of Amyotrophic Lateral Sclerosis were made by the medical liaisons.  Once again, no scientific data supported such claims.

k)     *Drug* and *Alcohol Withdrawal Seizures*.  Medical liaisons suggested that Neurontin be used in the treatment of drug and alcohol withdrawals despite the lack of any data supporting Neurontin as an effective treatment for these conditions.

109.   The knowing and willful misrepresentations were made to promote and market Neurontin for scientifically unproven uses so that Defendants could achieve significant market expansion in Massachusetts for Neurontin.

**F.    Defendants' Use of "Medical Liaisons" to Promote Unproven Uses**

111.    During the Class Period, Defendants' representatives unfairly and deceptively failed to provide balanced, truthful information regarding scientifically unproven uses for Neurontin.

112.    Defendants hired and trained "medical liaisons" to engage in full-scale promotion of Neurontin's unproven uses.

113.    Defendants also trained the "medical liaisons" to deceptively engage in full-scale promotion of Neurontin's unproven uses including repetitive distribution of non-scientific information.

114.    Defendants also trained the "medical liaisons" to deceptively engage in full-scale promotion of Neurontin's unproven uses including repetitive distribution of anecdotal information.

115.    Defendants also trained the "medical liaisons" to deceptively engage in full-scale promotion of Neurontin's unproven uses including repetitive distribution of information designed to ultimately convince consumers that unproven uses of Neurontin was safe and effective.

116.    The "medical liaisons" were selected and promoted based on their ability to sell.

117.    "Medical liaisons" were solicited to learn unfair or deceptive sales methods.

118.    On April 16, 1996, at a training session for medical liaisons, Defendants' in-house lawyers stopped the videotaping of a medical liaison training session to teach/advise the liaisons that notwithstanding formal policies to the contrary, there was no need to present balanced information to the customers and that liaisons should always remember that sales were necessary in order to keep the company profitable.

119.   The liaisons were also advised that once the medical liaison got a meeting with a doctor, there were ways to get the information about unproven Neurontin uses to the doctor.

120.   The liaisons were advised by the Defendants' lawyers that under no circumstances should any information about unproven uses be put in writing.

121.   "Medical liaisons" were instructed in the clearest possible terms that they were to market and sell Neurontin based on its unproven uses. Defendants had actual knowledge of the complete lack of scientifically valid data that supported such uses.

122.   During a teleconference on May 24, 1996, John Ford ("Ford"), a senior marketing executive at Defendants' Morris Plains headquarters, directly informed the "medical liaisons" that in order to market Neurontin effectively, Neurontin had to be marketed for monotherapy, pain, bipolar disorder and other psychiatric uses, all of which lacked scientific and medical data.

123.   Ford conceded that such marketing had to be primarily performed by the "medical liaisons".

124.   At another meeting with the "medical liaisons", Ford was even more blunt:

> "I want you out there every day selling Neurontin. Look this isn't just me, it's come down from Morris Plains that Neurontin is more profitable. We all know Neurontin's not growing as an adjunctive therapy, beside that is not where the money is. Pain management, now that's money. Monotherapy, that's money. We don't want to share these patients with everybody; we want them on Neurontin only. We want their whole drug budget, not a quarter, not half, the whole thing . . . .We can't wait for them to ask, we need to get out there and tell them up front . . . That's where we need to be holding their hand and whispering in their ear Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything ... I don't want to see a single patient coming off Neurontin until they have been up to at least 4800 mg/day, I don't want to hear that safety crap either, have you tried Neurontin, every one of you should take one just to see there is nothing, it's a great drug."

125.   "Medical liaisons" were trained to cold call high-volume physicians (those

who saw the most patients in a given specialty), and sell them on the benefits of Neurontin for unproven uses.

126.    A key aspect of this selling was willful and knowing misrepresentations willfully and knowingly made with the intent to deceive.

## H.    Misrepresentation of Credentials and Qualifications

127.    The first misrepresentation was usually the status of the "medical liaisons."

128.    With the full approval of Defendants' marketing officials such as John Ford, Phil Magistro and John Krukar, "medical liaisons" were routinely introduced as specialists in the specific drug they were presenting at a particular meeting.

129.    Starting out with this false fact, "medical liaisons" could be "experts" in anti-epileptic drugs at one moment and an hour later be an "expert" in cardiac medication.

130.    "Medical liaisons" were also encouraged to represent themselves as medical researchers, even though they neither conducted medical research nor analyzed medical research performed by others.

131.    It was not uncommon for "medical liaisons" to be introduced as physicians, even though they had no such qualifications.

132.    Sales personnel were instructed to introduce "medical liaisons" as scientific employees who were given momentary leave of their academic duties to make an individual presentation to the physician; the fact that the liaisons were part of Defendants' standard marketing detail was intentionally hidden.

133.    Defendants' employees instructed "medical liaisons" on the procedure that should be followed when presenting Neurontin to a neurologist, general practitioner, or psychiatrist who was a target for unproven uses:

20

- Mention that you are the eyes and ears of Defendants' research and that you are gathering clinical info;

- Ask general questions about the nature of the practice;

- Ask leading questions about the number of pain patients that the practice sees;

- Ask a series of questions that determine the practice profile;

- Reveal that Defendants have "a great deal of information about the fantastic response rate of patients on Neurontin in all of these disease states";

- Move into a discussion of the clinical trials that this information is demanding and the "90-95% response rate that we are seeing in more than 80% of patients";

- Present the doctor with any publications that are available and point out that many common drugs for pain treatment are in few if any publications;

- Ask the physician to place some patients on Neurontin and tell them that the "medical liaison" will stay in touch to help develop case reports;

- Mention that case reports can be lucrative and can lead to clinical trials;

- Offer to do a presentation and luncheon for the entire practice or a group of his friends that will detail all of the "data" we have;

- Invite the physician to consultant meetings in the future and point out that they pay $250 plus a nice trip or meal in the city; and

- If a sales representative is present they should close the sale by asking that the next patient he sees should be put on Neurontin.

134.    The "medical liaisons" were provided with new company slides that detailed the "method" to use to increase the use of Neurontin in several different practice types.

135.    The slide show contained a slide that showed the "Anecdotal Uses of Neurontin." The list included the following scientifically unproven uses:

- Reflex sympathetic dystrophy (RSD)

- Peripheral neuropathy

- Diabetic neuropathy

- Trigeminal neuralgia

- Essential tremor

21

136.    The medical liaisons were provided with new company slides

- Restless leg syndrome (RLS)
- Attention deficit disorder (ADD)
- Periodic limb movement disorder
- Migraine
- Bipolar disorder
- Amyotrophic lateral sclerosis (ALS) [Lou Gehrig's Disease]
- Drug or alcohol withdrawal seizures

137.    Executives explained that "this list was very important to the company but that it makes Neurontin look like snake oil, so preempt the laughter by telling your physicians that 'I'm embarrassed to show you the next slide because it makes Neurontin look like snake oil, but the fact is, we are seeing extra-ordinary results, in some cases up to 90% response in all of these conditions,' that will get their attention."

138.    This executive went on to say that, "[n]otice all the studies we talk about, nothing gets a doc more interested in a drug than a study."

139.    Richard Grady, a medical liaison, asked if "we have any money to lace studies without big docs." He was instructed to "use the potential of a study to get in the door, even get protocols, but don't waste too much time and don't say you can get them a study, we don't have much money left."

140.    He was then told that "if anyone asks for back-up data say we are putting it together, then suggest that the doc put some of his patients on Neurontin and we will help him publish case reports that could help place a study in his practice. Everybody wins."

141.    None of the claims made in the slide show have been scientifically substantiated.

142.    None of the indications made in the slide have been scientifically

22

supported.

143.    The deceptive claims made in the slide show were a component of the Defendants' scheme to increase sales of Neurontin for unproven uses.

144.    Misrepresentations by Defendants were not limited to presentations by "medical liaisons." As noted above, publications that Defendants distributed as part of their "publication strategy" intentionally misrepresented Defendants' role in the creation and sponsorship of the publications.

145.    Many of the publications were created by Defendants and written by third parties retained by Defendants and who were under Defendants' control.

146.    The fact that these articles were authored by ghost writers retained by Defendants was willfully and knowingly hidden, and the fact that the authors had financial ties to Defendants was also willfully and knowingly undisclosed.

147.    For example, an article widely circulated by Defendants concerning the use of Neurontin in the treatment of Restless Leg Syndrome asserted that the authors Gary A. Mellick and Larry B. Mellick, had not and never would receive financial benefit from anyone with an interest in Neurontin, yet the Mellick brothers had received tens of thousands of dollars for acting as speakers at Defendants' events.

148.    This financial connection was deceptively hidden from the persons who received copies of the Mellick brothers' articles.

149.    Defendants deceptively paid doctors to prescribe Neurontin by falsely representing they would include those patients in clinical trials, which were actually designed for marketing purposes.

150.    Defendants engaged in an extensive and far-reaching campaign to use false statements to promote increased prescriptions of Neurontin.

151.    The scheme used a team of "medical liaisons." While "medical liaisons"

are ordinarily connected to the research divisions of the manufacturer, Defendants' "medical liaisons" were exclusively employed as sales and promotion personnel.

152.    Defendants' "medical liaisons" were instructed to make exaggerated or false claims concerning the safety and efficacy of Defendants drugs for unproven uses.

153.    For instance, the "medical liaisons" were trained to convey that Neurontin could be prescribed for its various uses in amounts of up to 4800 mg/day — far above the maximum dosage supported by any scientific data.

154.    "Medical liaisons" were encouraged to misrepresent their scientific credentials and to pose as research personnel, rather than as sales representatives. This practice continued in the years 2000, 2001 and may still be continuing.

155.    In 2000, Warner-Lambert reported that more than 78% of Neurontin prescriptions had been written for indications other than epilepsy.

156.    Sales of Neurontin that year were $1.3 billion, and they rose to $1.7 billon, according to IMS Health (news/quote), a health care information company.

I.    **Payments to Authors of Ghost Written Articles**

157.    Another unfair and deceptive practice included the secret payment to some doctors for lending their names to scientific articles that were actually prepared and written by third parties retained by Defendants.

158.    In 1996, Defendants retained AMM/Adelphi, Ltd. and Medical Education Systems, Inc. to prepare no less than twenty (20) articles for publication.

159.    Most of these articles concerned unproven uses of Neurontin.

160.    These articles were generated in a way that resulted in Defendants retaining complete control over publications they could distribute pursuant to their "publication strategy."

161.    The content of these articles were actually written by non-physician

technical writers retained and directed by Defendants.

162.    Defendants paid all expenses in connection with the creation of these publications.

163.    Defendants had the right to control the content of all the articles.

164.    Once Defendants and the technical writers conceived the articles, Defendants and their outside firms attempted to find recognized Neurontin prescribers whose names could be used as the authors of these articles.

165.    In some cases, drafts of the articles were completed even before an author was identified and agreed to place his or her name on the article.

166.    This occurred in connection with case histories that purported to describe the author's personal treatment of actual patients.

167.    The authors were each paid an honorarium to lend their names to these articles.

168.    The authors were each able to claim publication credit on their curriculum vitae.

169.    After the technical writers completed their work, Defendants and their outside firms found journals that would publish the articles.

170.    Defendants' role in creating, approving and sponsoring the articles was unfairly and deceptively hidden from the public and the medical community.

171.    Defendants intentionally failed to disclose their role in creating, approving and sponsoring the articles to the public and the medical community.

172.    While the articles might reference that the author received an honorarium, the articles deceptively failed to state that the honorarium was paid with money provided by Defendants.

173.    While the articles might reference that the author received an honorarium,

articles failed to state that Defendants had approved the content and hired the actual authors.

174.    For example, an article created by the Defendants through the Medical Education Systems (MES), *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders,* published in CNS Spectrums noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed Defendants retention and payment of MES.

175.    The article created by the Defendants through Medical Education Systems (MES), *Gabapentin and Lamotrignine: Novel Treatments for Mood and Anxiety Disorders,* published in CNS Spectrums noted that "an honorarium was received from Medical Education Systems for preparation of this article," but never revealed the fact that MES personnel, while under contract to Defendants, wrote the article.

176.    Defendants used these publications as part of their unfair and deceptive marketing campaign and "publication strategy" by presenting the articles as evidence of independent research conducted by persons with no monetary interest in Neurontin.

177.    This conduct was intended to deceive and was known by the Defendants to be false.

178.    Defendants deceptively created the articles to promote unproven uses for Neurontin on the basis of scientifically invalid facts and premises they otherwise knew to be false.

179.    Defendants deceptively purchased the names and reputations of the authors with kickbacks.

180.    Defendants deceptively controlled the content of the articles.

**J.    Defendants' Systematic Payments to Doctors for the Purpose of Increasing Neurontin Prescriptions**

181.    Defendants' unfair and deceptive "publication strategy" called upon

certain paid physicians (and their medical liaisons) to perform the work normally performed by the company's salesmen in order to promote Neurontin.

182.    As part of this strategy, Defendants deceptively paid these physicians who acted as a surrogate sales force. The following describes the various programs Defendants used to make these payments to physicians.

### 1.    "Consultants" Meetings

183.    Defendants paid certain physicians to deceptively misrepresent the safety, efficacy, effectiveness and usefulness of Neurontin for scientifically unproven uses through "consultants" meetings with the ultimate goal of increasing their profits all at the economic expense of the members of the Class.

184.    At these meetings, Defendants and their paid physicians would give unsuspecting doctors lengthy presentations relating to Neurontin, particularly regarding unproven uses.

185.    Defendants' employees or physician speakers hired by Defendants for the purpose of promoting Neurontin would make presentations.

186.    At some conferences, the sponsoring organization or Defendants intentionally posed questions to the speakers about unproven uses to insure that the attendees were exposed to such information.

187.    A typical consultants' meeting was held in Jupiter Beach, Florida, for neurologists from the North East CBU including Massachusetts during the weekend of April 19-21, 1996.

188.    In a memorandum announcing the event to Defendants' personnel, the Neurontin Marketing Team acknowledged that in order to target neurologists with the greatest potential for writing Neurontin prescriptions, sales personnel must select potential attendees from a list of the top prescription writers for anti-epileptic drugs in the

Northeast.

189.    Only the doctors who fell within this targeted demographic were authorized to be invited.

190.    The Jupiter Beach "consultants" meeting included two one-half days of presentations by Parke-Davis relating to Neurontin, including extensive presentations relating to scientifically unproven uses.

191.    Although the presentations were represented to be provided by Proworx, an independent company, all aspects of the presentation were deceptively designed, monitored and approved by Defendants.

192.    Defendants selected the speakers, picked the presentation topics and previewed the content of the presentations to make sure that they were acceptable.

193.    Defendants hosted dozens of "consultants" meetings between late 1995 and 1997 in which presentations were made on unproven Neurontin uses designed to change the physicians' prescription writing habits.

194.    Another such "consultants" meeting occurred at the Ritz Carlton, Boston, MA on May 10-11, 1996.

195.    At the Boston meeting in May 1996, Defendants' representative made false and misleading statements that Neurontin was effective for trigeminal neuralgia at unusually high doses, but failed to disclose the side-effects, the absence of toxicology data or that Defendants' owns clinical trials questioned the existence of the dose relationship.

196.    Defendants' representative also falsely stated at the Boston meeting that adverse reactions tend to be idiosyncratic, and that they did not seem to be dose-dependent despite having medical evidence that side effects were indeed dose responsive.

197.    During the Class Period, Defendants had actual knowledge of the

28

Inspector General's Special Fraud Alert, which raised particular concerns about drug marketing.

198.    Nonetheless, Defendants did nothing to curb their marketing practices knowing that they could not have profited so greatly without unfairly and deceptively marketing Neurontin for unproven uses.

199.    In 1997, Defendants conducted a review of their marketing practices.

200.    As a result of that review, Defendants determined that *none* of their Neurontin related sales programs described above should have been conducted in the manner previously conducted by Defendants.

## K.    Medical Education Seminars

201.    Another forum where Defendants unfairly and deceptively promoted Neurontin for unproven uses was through Continuing Medical Education seminars ("CME").

202.    While Defendants retained third-party organizations, such as Proworx and MES, to present the event seminars, they had control of virtually every aspect of these events.

203.    Proworx and MES obtained Defendants' approval for all content presented at the seminars.  This fact was kept secret and the information was misrepresented as being independent.

204.    Defendants also secretly paid all expenses, including all the seminar companies' fees.

205.    Although the seminar companies acted as the conduit, Defendants controlled every aspect of the CME programs.

206.    As to the CME Neurontin programs:

a)       Defendants unfairly and deceptively designed and approved the programs;

b)  Defendants unfairly and deceptively hand-picked the speakers for the seminars;

c)  Defendants unfairly and deceptively approved the seminar presentations of the seminars;

d)  Defendants previewed, in most cases, the contents of the seminars prior to delivery;

e)  Defendants selected the attendees;

f)  Defendants evaluated the presentations to make sure their "message" was appropriately delivered;

g)  Defendants black-listed presenters whose presentations were not sufficiently pro-Neurontin; and

h)  Defendants monitored the prescribing patterns of the physicians who attended these conferences to insure the purpose of the conference - increased writing of Neurontin prescriptions - was achieved.

207.  Representative CME programs in Massachusetts sponsored by Defendants included, but are not limited to, the following:

a)  Diabetic Neuropathy - Ritz Carlton, Boston, MA - June 22-24, 1997

b)  Merritt-Putnam Symposium - Boston, MA - December 5, 1997

## L.  Defendants' Unfair and Deceptive Promotions Has Continued as Has the Continuing Impact of the Earlier Misconduct

208.  As a result of the activities described above, many of which continue today, Massachusetts consumers were inundated with false and misleading information about Neurontin. As a result, they continue to take Neurontin for uses for which there is no reliable scientific support.

209.  This continuing course of conduct is evidenced in part by the staggering growth of Neurontin sales for scientifically unproven uses.

210.  Because there are no valid scientific studies supporting Neurontin use for Bipolar Disorder; Peripheral Neuropathy, Diabetic Neuropathy and other pains

syndromes; Epilepsy Monotherapy; Reflex Sympathetic Dystrophy; Attention Deficit Disorder; Restless Leg Syndrome; Trigeminal Neuralgia; Essential Tremor Periodic Limb Movement Disorder; migraines; Amyotrophic Lateral Sclerosis; and drug and alcohol withdrawal seizures, a reasonable inference can be drawn that Neurontin prescriptions for unproven uses are caused from past and continuing promotional efforts by Defendants.

211.    First, from the perspective of overall Neurontin sales, usage of Neurontin for scientifically unproven uses has actually *increased* during the years since 1999: in recent years, prescriptions for unproven Neurontin uses have exceeded 90% of all sales.

212.    Second, although Neurontin is prescribed for scores of scientifically unproven indications, since 1999 the types of unproven usage continue to be weighted in the precise areas where Defendants focused their unlawful marketing efforts: bipolar disorder, peripheral neuropathy, migraine, etc.

213.    Third, these focus treatment areas of continuing unproven uses are subject to very intense competition between therapeutic substitutes (other drugs or treatments).

214.    Fourth, Defendants, like most branded drug companies, monitor the relationship of their sales to their promotional efforts in a very short timeframe.

215.    The persistent maintenance of high Neurontin sales within multiple, targeted areas lacking any scientific basis over a period of years defies the conclusion that any significant backing away on the marketing, sales or promotion on Neurontin to each of those unproven therapeutic areas.

216.    For example, sales of Neurontin for the treatment of bipolar disorder have steadily increased since its introduction. This increase is a direct result of Defendants' sales representatives recommending to doctors its use for this purpose and their distribution of promotional materials.

217.    There are no valid scientific studies that support Neurontin's use for bipolar disorders.

218.    In fact, a scientifically valid study conducted by Harvard Bipolar Research Program found that patients **did worse on Neurontin than those who were on a sugar pill**. Parke-Davis failed to publish the results for two years.

219.    Dr. C. Seth Landefeld has submitted an expert opinion in a *qui tam* lawsuit against the Defendants stating that a review of Drugdex for Neurontin, as of the end of August 2002, reveals "no published scientific studies to support "Neurontin's use for ... bipolar disorder."

220.    As a result, tens of thousands of patients who need help and could use other drugs whose effectiveness have been established, were given and are being given Neurontin.

221.    These prescriptions for this purpose are still being written and are a direct result of Defendants' pre-2000 illegal promotional activities and post-2000 illegal promotional activities.

222.    Likewise, sales of Neurontin for pain, ALS, attention deficit disorder, and depression are also increasing without any scientific evidence supporting use of Neurontin for such indications.

223.    Again, as noted by Dr. Landefeld, as of the end of the third quarter of 2002 "there were no published scientific studies to support Neurontin's use for any of these indications or in an increased dose."

224.    In fact, through this date there are no published scientific studies to support Neurontin's use for "any of these indications or in an increased dose."

225.    Overall, sales of Neurontin scientifically unproven uses have steadily increased since 1998, and from 2000 to the present have consistently remained at 93% to

4% of all sales.

226.    Given the absence of scientific support for such uses, the genesis for those sales can only be past and continuing efforts by Defendants to unfairly and deceptively promote the uses.

227.    These continuing promotional efforts are evidenced in part by a July 1, 2002 letter from Dr. Lisa Stockbridge of the Department of Health & Human Services ("HHS") to Pfizer, in which HHS notified Pfizer that certain of its promotional and marketing practices concerning Neurontin were false and misleading.

228.    In particular, HHS had the following objections about Pfizer's promotional activities:

> The presentation on the model of illustrations of cellular activity resulting from the administration of Neurontin ("Mechanism of Action"), in conjunction with the presentation of the human brain, and the prominent display of the name Neurontin makes representations about how Neurontin acts in the human brain. This presentation along with the depiction of the human brain and the prominent display of the name "Neurontin" suggest that the mechanism of action of Neurontin has been established in the human brain. This suggestion of proof of the mechanism of action is false.

229.    To address these objections, recommendation was made that Pfizer do the following:

> Immediately discontinue the use of this model and any other promotional material with the same or similar issues.

230.    These continuing efforts to illegally promote Neurontin for scientifically unproven uses are also evidenced in part by a letter from HHS dated June 6, 2001, in which HHS found Pfizer to have again deceptively promoted Neurontin.

231.    HHS sent this letter in response to Pfizer's promotional advertising sent to doctors in 2001 claiming that a study had indicated "Quality of Life Improvements" with use of Neurontin.

232.    HHS found this promotional material to be misleading.

Specifically, this slim jim misleadingly claims improvements in quality of life (QOJ-) parameters based on the Neurontin Evaluation of Outcomes in Neurological Practice (NEON) study. Among other QOL parameters, the misleading presentation includes improvement in social limitations, memory difficulties, energy level, and work limitations. The NEON study is not considered to be substantial evidence for claims of QOL improvements because it is not a controlled study.

308.    To address the false and misleading promotion, a recommendation was made to:

1)    Immediately discontinue the use of this slim jim and any other promotional material and practices with the same or similar messages.

2)    Respond to this letter within ten days.  Your response should include a statement of your intent to comply with the above, a list of all promotional materials with the same or similar issues, and your methods for discontinuing these promotional materials.

309.    Defendants' employees had been using the foregoing promotional materials to promote such uses of Neurontin to consumers up until this letter of June 6, 2001.

310.    Defendants disseminated promotional material suggesting that Neurontin was "well tolerated" with "proven efficacy" at doses "up to 2400 mg/day" and that doses of 3600 mg/day were also "well tolerated."

311.    There was no scientific evidence for such representations.

312.    These promotional efforts are unfair and deceptive attempts to encourage scientifically unproven uses.

## M.    Defendants' False and Misleading Promotions Were Profit Driven

313.    The uses of Neurontin which were and are actively being promoted by Defendants are uses which are not recognized as accepted uses by the medical community.

314.    Despite the lack of scientific support, Defendants engaged in promotional activities for the purpose of having Massachusetts consumers take Neurontin for such

uses. Such conduct constitutes unfair or deceptive acts or practices.

315.    With the complete absence of scientific support for such uses, sales growth that occurred for the unproven use of Neurontin was the result of Defendants' continuing promotional activities.

316.    In 1995, Defendants' revenue from the sale of Neurontin was $97.5 million; by 1997, sales increased to $292 million; by 1999, sales increased to $913 million; by 2000, sales increased to $1.3 billion; and by 2003, sales were nearly $2.7 billion.

**N.    Criminal Liability**

317.    In 1996, Dr. Franklin filed a *qui tam* action on behalf of the United States against Warner-Lambert, alleging false claims caused by the knowing promotion of prescription sales of Neurontin ineligible for Medicaid reimbursement. In April 2003, Dr. Franklin filed an opposition to summary judgment in the *qui tam* action which unsealed numerous documents revealing the existence and operation of Defendants' fraudulent marketing practices.

318.    Based upon the conduct alleged in the *qui tam* action, the U.S. Department of Justice filed a criminal information against Warner-Lambert.

319.    On May 13, 2004, Warner-Lambert announced that it agreed to plead guilty and pay more than $430 million to resolve the criminal charges in connection with Parke-Davis's fraudulent promotion of Neurontin.

**O.    Fraudulent Concealment**

320.    Throughout the Class Period, Defendants effectively, affirmatively and fraudulently concealed their unfair and deceptive conduct.

321.    Because of the self-concealing nature of Defendants' actions, and their affirmative acts of concealment, Plaintiffs could not have reasonably discovered

Defendants' unfair and deceptive conduct alleged herein until at the earliest, May 2003 when certain documents revealing the existence and operation of Defendants' fraudulent marketing practices were unsealed in the Franklin *qui tam* case.

322.    Defendants' unfair and deceptive conduct as alleged in this Complaint was carried out through means and methods which were designed and intended to avoid detection, and which in fact successfully precluded detection for a substantial period of time.

323.    As described above, Defendants created and implemented an unfair and deceptive marketing and sales scheme using facially plausible consultant meetings, education seminars and journal articles. In addition, Defendants hid their involvement and financial connections with the physician participants and intermediaries.

324.    These practices of secrecy included, *inter alia*:

a)    deliberately misrepresenting the safety, medical efficacy, effectiveness and usefulness of Neurontin for a variety of unproven uses;

b)    knowingly misrepresenting the existence and findings of scientific data, studies, reports and clinical trials;

c)    deliberately concealing negative findings or the absence of positive findings;

d)    misrepresenting the credentials and qualifications of certain of Defendants' employees as specialists, medical researchers, physicians and scientific employees in order to market and sell Neurontin;

e)    knowingly publishing articles, studies and reports misrepresenting the scientific credibility of data regarding Neurontin;

f)    intentionally misrepresenting and concealing Defendants' role and participation in the creation and sponsorship of a variety of events, articles and publications used to sell Neurontin;

g).    intentionally misrepresenting and concealing the financial ties between the Defendants and certain firms and physicians; and

i)    fraudulently using "medical liaisons" to directly solicit, market and

promote Neurontin for unproven uses to physicians.

325.    Although Plaintiffs exercised due diligence during the Class Period by promptly investigating the facts giving rise to the claims asserted herein, Plaintiffs did not discover the Defendants' unfair and deceptive conduct until at the earliest, May 2003.

326.    To this day, Defendants have and continue to conceal much of their promotional activities.

327.    By virtue of the fraudulent concealment of their unfair and deceptive conduct, the running of any statute of limitations has been tolled and suspended with respect to any claims and rights of action that Plaintiffs and the other Class members have as a result of Defendants' unfair or deceptive acts or practices.

## P.    Impact in the Commonwealth of Massachusetts

328.    Defendants' marketing scheme was directed in part to increase sales and profits of Neurontin in the Commonwealth of Massachusetts.

329.    As part of this scheme, Defendants sent promotional materials to doctors in the Commonwealth of Massachusetts in an effort to increase the sales in the Commonwealth of Massachusetts of Neurontin for uses not proven to be safe, efficacious, effective or useful.

330.    The Defendants' secretly funded "studies" regarding the effectiveness of Neurontin were disseminated to doctors in the Commonwealth of Massachusetts.

331.    Tens of thousands of Massachusetts residents have taken Neurontin as a direct, intended and foreseeable result of Defendants' scheme to treat conditions for which the drug is not medically safe, efficacious, effective or necessary.

**COUNT ONE**

**Unfair and Deceptive Practices - G.L. c. 93A, §2 and §9**

332.    Plaintiffs incorporates the preceding paragraphs as if fully set forth herein.

333.    Defendants were engaged in trade or commerce as defined by G.L. c. 93A.

334.    Defendants' actions, as complained of herein, constitute unfair or deceptive acts or practices committed in violation of G.L. c. 93A, § 2.

335.    Defendants engaged in unfair or deceptive acts or practices, undertaken willfully and knowingly in violation of G.L. c. 93A, § 2 when:

a)  Defendants caused third parties to publish and make factual representations and statements designed to promote Neurontin that were false, misleading and/or deceptive;

b)  Defendants unfairly and deceptively sold Neurontin to Plaintiffs and the Class based upon statements made by a third party that Defendants hired or improperly influenced, that were deceptive;

c)  Defendants omitted material information known to them in order to induce Plaintiffs and the Class to use Neurontin;

d)  Defendants knew that published studies promoting Neurontin lacked the scientific integrity that was expected of such studies and acted to conceal adverse studies and a balanced statement of the facts;

e)  Defendants sent promotional literature regarding uses of Neurontin that were false and misleading;

f)  Defendants distributed false and misleading information for the purpose of causing Massachusetts doctors to prescribe Neurontin for scientifically unproven conditions and to deceive Plaintiffs and members of the Class into believing that such uses were appropriate;

g)  Defendants' used grants or other forms of compensation to influence doctors to author "studies" that were not scientifically supported but which showed favorable results using Neurontin;

h)  Defendants issued payments honorariums, consultant fees and the like, all for the purpose of encouraging scientifically unproven uses of Neurontin;

i)  Defendants embarked on a marketing scheme with the purpose to deceive Plaintiffs and the Class; and

j)  Defendants falsely and deceptively marketed Neurontin for uses for which no valid scientific data existed.

336.    All of the conduct alleged herein occurs and continues to occur in

fendants' business. Defendants' unfair and deceptive conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

337.    Further, each of the above acts constitutes an unfair and/or deceptive act or practice in violation of G.L. c. 93A, § 2, and is a distinct and independent violation of Massachusetts law.

338.    As a direct and proximate result of Defendants unfair or deceptive acts or practices, Plaintiffs and the Class have suffered actual economic damage by paying for Neurontin to treat conditions that lacked scientific, medical and clinical data concerning safety, efficacy, effectiveness or usefulness.

339.    Plaintiffs and the Class were injured by reason of unlawful acts of Defendants as alleged herein and are therefore entitled to actual damages or, in the alternative statutory damages.

340.    Each of the Defendants has been served with a demand letter in accordance with G.L. c. 93A, § 9.  (Attached as Exhibit I is the most recent demand letter sent by Plaintiffs).

341.    More than thirty days has passed since such demand letters were served, and each Defendant has failed to tender a settlement offer despite exclusive possession and control of information that reasonably establishes a reason to know that the conduct of which Plaintiffs complain violates G.L. c. 93A, § 9.

342.    Defendants' violations of G.L. c. 93A were knowing or willful, entitling Plaintiffs and the Class to double or treble damages.

343.    Defendants' refusal to tender a reasonable offer of settlement to a Class of persons that suffered monetary losses and other injury as a result of conduct that they had reason to know violated G.L. c. 93A, §9(3) also supports a claim for treble damages, attorneys' fees, interest, costs and other relief provided for in G.L. c. 93A, §9.

344.    As persons injured by Defendants unlawful conduct, Plaintiffs and the Class are entitled additionally to recover interest on damages, attorneys' fees and costs.

## COUNT TWO

### Unfair and Deceptive Practices – False Advertising
### (G.L. c. 93A, et seq. and 940 CMR § 3.02, as promulgated thereunder)

345.    Plaintiffs incorporates the preceding paragraphs as if fully set forth herein.

346.    Defendants' actions, as complained of herein, constitute false advertising in violation of 940 CMR § 3.02, as promulgated pursuant to G.L. c. 93A § 2(a) for purposed of determining whether conduct, terminology or representations involve unfair methods of competition or unfair or deceptive acts or practices.

347.    940 CMR § 3.02 provides that "No statement or illustration shall be used in any advertising which creates a false impression of the ... quality, make ... usability or origin of the product offered, or which may otherwise misrepresent the product in such a manner that later, on disclosure of the true facts, there is a likelihood that the buyer may be switched from the advertised product to another."

348.    Defendants falsely marketed, advertised and sold Neurontin to treat conditions that lacked scientific, medical and clinical data concerning safety, efficacy, effectiveness or usefulness.

349.    As a result of the violations of 940 CMR § 3.02 described above, Massachusetts consumers have purchased Neurontin, which was advertised, promoted, marketed and sold in the Commonwealth of Massachusetts through advertising and marketing materials that misrepresented the safety, efficacy, effectiveness and usefulness of the product.

350.    Plaintiffs and the Class would not have purchased Neurontin had they known the true facts; that Defendants misrepresented the scientific, medical and clinical data related to the safety, medical efficacy, effectiveness and usefulness of Neurontin for

tions other than the treatment of epilepsy and post-herpetic neuralgia.

351.    Plaintiffs and the Class were injured by reason of unlawful acts of Defendants as alleged herein and are therefore entitled to actual damages or, in the alternative statutory damages.

352.    Defendants' violations of 940 CMR § 3.02 and G.L. c. 93A were knowing and willful, entitling Plaintiffs and the Class to double or treble damages.

353.    As persons injured by Defendants unlawful conduct, Plaintiffs and the Class are entitled additionally to recover interest on damages, attorneys' fees and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs pray:

A)    That the Court determine that this action may be maintained as a class action pursuant to G.L. c. 93A, § 9(2) and/or Rule 23 of the Massachusetts Rules of Civil Procedure and direct that reasonable notice be given to members of the Class;

B)    That the acts and practices alleged herein be adjudged and decreed to be a violation of G.L. c. 93A, § 2.

C)    That Plaintiffs and the Class be awarded their actual damages determined at trial or, in the alternative, statutory damages pursuant to G.L. c. 93A, §9(3);

D)    That Plaintiffs and the Class be awarded double or treble damages pursuant to G.L. c. 93A, § 9(3);

E)    That Plaintiffs and the Class recover interest on the damages awarded;

F)    That Plaintiffs and the Class be awarded reasonable attorneys' fees and costs of suit, pursuant to G.L. c. 93A, § 9(4); and

G)    The Court grant such other relief as it may deem just and equitable.

ED: March 21, 2005

Respectfully submitted,

Robert J. Bonsignore, BBO #547880
Daniel D'Angelo, BBO # 630321
BONSIGNORE & BREWER
23 Forest Street
Medford, MA  02155
(781) 391-9400

# EXHIBIT 1

# BONSIGNORE & BREWER

### TRIAL LAWYERS
**www.bandblaw.net**
23 FOREST STREET
MEDFORD, MASSACHUSETTS 02155-3820

VOICE: (781) 391-9400

February 23, 2005

FAX: (781) 391-9496

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**No. 7004 1350 0000 3484 8559**
**Pfizer, Inc.**
235 East 42nd Street
New York, NY 10017

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**No. 7004 1350 0000 3484 8566**
**Parke-Davis**
2800 Plymouth Road
Ann Arbor, MI 48105

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
**No. 7004 1350 0000 3484 8573**
**Warner-Lambert Co.**
201 Tabor Road
Morris Plains, NJ 07950

Re:    **Consumer Demand Letter Pursuant to the Massachusetts Consumer
Protection Act, Mass. Gen. Laws c. 93A**

Dear Sirs and/or Madams:

Please be advised that this office represents Claimants and putative class representatives, Laura Allen, Administratix of the Estate of the Late Daniel Allen, Timothy Bridges, Alfred Morabito, Scott M. Bernard and others, Massachusetts consumer purchasers of Neurontin (hereinafter referred to as "Claimants"), and all other similarly situated Massachusetts resident consumers in their claims for damages against PFIZER, INC., individually and as successor in interest to PARKE-DAVIS and WARNER-LAMBERT CO. and others known only to the aforementioned parties (hereafter collectively referred to as "Pfizer", "Respondents" and/or "you"). This letter serves as a written demand for relief pursuant to Massachusetts General Laws Chapter 93A, §9(3) and another attempt by Claimants to facilitate a genuine settlement dialogue. To the extent that you did not understand or accept our first correspondence, we provide you with this substitute.

## SUMMARY DEMAND

From 1994 to the present, Pfizer created and implemented an unfair or deceptive marketing and sales scheme that misrepresented the scientific, medical and clinical data related to the safety, medical efficacy, effectiveness and usefulness of Neurontin for medical conditions other than for adjunctive therapy for epilepsy and for post-herpetic neuralgia. The purpose of the unfair or deceptive scheme was to substantially increase the sales and profits of Neurontin at the expense of Massachusetts consumers.

Pfizer knowingly and willingly engaged in unfair or deceptive acts or practices that caused Massachusetts consumers to pay for Neurontin to treat a variety of symptoms for which Neurontin was not proven to be safe, efficacious, effective or useful. Using their own employees, intermediary medical marketing firms and unsuspecting physicians, Pfizer unfairly and deceptively marketed and sold Neurontin to treat a multitude of medical conditions despite Pfizer's knowledge that there was no scientific basis to support such uses. Pfizer's unfair or deceptive marketing and sales practices included: (1) deliberate misrepresentations concerning the scientific, medical and clinical data related to safety, efficacy, effectiveness and usefulness of Neurontin for medical conditions other than as an adjunct therapy for epilepsy (1994) and for post-herpetic neuralgia (2003); (2) knowing creation, publication and dissemination of articles, reports and studies misrepresenting the scientific credibility of data and authors of such articles, reports and studies; (3) deliberate misrepresentations of the credentials and qualifications of certain Pfizer employees as purported specialists, researchers or physicians in order to market and sell Neurontin for scientifically unproven uses; (4) organizing seminars and encouraging physicians to prescribe Neurontin for uses not proven to be safe, efficacious, effective or useful; and (5) intentional misrepresentations and concealment of Pfizer's role and participation in the creation and sponsorship of seminars, events, articles and publications aimed at selling Neurontin for medical conditions other than as an adjunct therapy for epilepsy and for post-herpetic neuralgia.

The putative class includes all Massachusetts resident consumers who purchased Neurontin as prescribed for scientifically unproven uses between January 1, 1994 and the present. ("Class Period"). Excluded from the class are consumers who purchased Neurontin as adjunctive therapy for the treatment of partial epileptic seizures and for post-herpetic neuralgia. All references in this correspondence other than those assigned a specific time frame are to the aforementioned class period.

Demand is made for the following economic relief:

1. That you offer full reimbursement to Claimants and each class member who purchased Neurontin for the treatment of medical conditions other than as an adjunct therapy for epilepsy or for post-herpetic neuralgia; or in the alternative

2. Statutory minimum damages in the amount of $25 per person as allowed under M.G.L. c. 93A, § 9(3); and

3. Reimburse Claimants and members of the proposed class for their reasonable attorney's fees and expenses incurred in asserting this claim.

Be clear that under Massachusetts state law your conduct entitles the Claimants to pursue a class action suit against you. The Massachusetts legislature made clear their intent to create a wholly state law cause of action for persons injured by an unfair or deceptive act or practice. Such persons can pursue a class action *"if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons."* G.L. c. 93A, § 9(2). Your common course of conduct presents the identical legal issue to all members of the putative class, namely, whether promoting the use of Neurontin for purposes having no scientifically valid support violated G.L. c. 93A, §§ 2, 9. Other unfair or deceptive practices exist, including but not limited to, whether the nature and extent of the marketing department ghost writers and the other unfair or deceptive acts or practices you undertook in target marketing the mentally ill, those in chronic pain and the terminally ill. Each member of the class is similarly situated to other persons who were victimized by your unfair or deceptive marketing and sales acts and practices. Each class member has suffered similarly economic injury and is entitled to restitution or statutory minimum damages.

## FACTUAL BACKGROUND

It is a matter of public record that Neurontin was approved on December 30, 1993 for the limited purpose of treatment of partial seizures with and without secondary generalization in adults with epilepsy in doses from 900 to 1800 milligrams a day. Neurontin was also approved in 2003 for the management of post-herpetic neuralgia in adults. The scientifically valid support you have on the efficacy of Neurontin remains limited. During the class period, the uses of Neurontin that you were able to garner scientific support was limited to adjudicative therapy in the treatment of partial seizures with or without secondary generalization in patients age 12 and over with epilepsy (as of 1994) and for the management of post-herpetic neuralgia in adults (as of 2003)(hereinafter referred to as adjunctive therapy for epilepsy and post-herpetic neuralgia).

Notwithstanding the fact you lacked scientifically valid support for the wide spread use of Neurontin, you selected the drug for "blockbuster"[1] status. You then aggressively marketed Neurontin in an unfair and deceptive manner for purposes having no scientifically valid support. The highly profitable conditions you unfairly and deceptively selected for promotion knowingly and willfully targeted the most vulnerable and desperate consumer groups. You unfairly and deceptively promoted Neurontin for medical conditions without scientific, medical and clinical data related to the safety, medical efficacy, effectiveness and usefulness of numerous conditions, including but not limited to:

1. Bipolar Disorder;
2. Pain Syndromes, Peripheral Neuropathy, and Diabetic Neuropathy;

---

[1] As you know, in the drug industry a "blockbuster" drug is any drug that sells $1 billion per year or more.

3. Epilepsy as a monotherapy;
4. Reflex Sympathetic Dystrophy (RSD);
5. Attention Deficit Disorder (ADD);
6. Restless Leg Syndrome (RLS);
7. Trigeminal Neuralgia;
8. Amyotrophic Lateral Sclerosis (ALS, a degenerative nerve disease commonly referred to as Lou Gehrig's Disease);
9. Essential Tremor Periodic Limb Movement;
10. Migraines; and
11. Drug and Alcohol withdrawal seizures;

You marketed, advertised, and distributed Neurontin in the Commonwealth of Massachusetts, benefiting from our laws and deriving substantial financial gain, all the while making material misrepresentations and omissions that reasonably altered consumer behavior. This and the other conduct referred to herein was knowing, willful, unfair and deceptive. The allegedly clinical evidence that you promoted was flawed, inadequate, misrepresented, unfair and/or deceptive and directly caused each member of the putative class to suffer similar economic injury.

As described herein, and as further documented in your own internal documents and corporate knowledge, at a minimum you actively manipulated, created, represented and/or disseminated intentionally false information concerning Neurontin's safety, medical efficacy, effectiveness and usefulness.[2]  You also failed to disclose or provide full information about the known true limitations of Neurontin use or the basis for your unfair or deceptive promotions. In essence, your product was no more effective than a sugar pill. Perhaps most reprehensible is the fact you chose to wrongfully profit at the expense of those in our society who are most vulnerable, *i.e.*, the mentally ill, the terminally ill and those in chronic pain.

Much of the information pertaining to your unfair or deceptive marketing and sales scheme that misrepresented the scientific, medical and clinical data related to the safety, medical efficacy, effectiveness and usefulness of Neurontin continues to remain in you exclusive possession and control. Likewise, information that would allow Claimants to identify the number of prescriptions written in the Commonwealth of Massachusetts to treat symptoms for which Neurontin was not proven to be safe, efficacious, effective or useful and the number of known patients in the Commonwealth of Massachusetts that were prescribed Neurontin for conditions where the scientific, medical and clinical data were misrepresented remains in your exclusive possession and control. As such, Claimants respectfully request that this information be provided as evidence of your interest in participating in good faith efforts to reasonably reach resolution of this claim.

---

[2] A successful G.L. c. 93A action based on deceptive acts or practices does not require proof that a plaintiff relied on the representation or that the Defendant knew that the representation was false, see *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 703, 322 N.E.2d 768 (1975), or even that the defendant intended to deceive the plaintiff which you did. See *Swanson v. Bankers Life Co.*, 389 Mass 345, 349, 450 N.E.2d 577.

# OVERVIEW OF MASSACHUSETTS CONSUMER PROTECTION LAW

All "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are illegal in the Commonwealth of Massachusetts. G.L. c. 93A § 2(a). A practice is "deceptive" for purposes of the Act if it could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted. In the same vein, we have stated that conduct is deceptive if it possesses a tendency to deceive. In determining whether an act or practice is deceptive, regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which the act or practice might reasonably be expected to have upon the general public. *Aspinall v. Philip Morris Companies, Inc.*, 442 Mass. 381, 394 (2004) (internal marks and citations omitted).

Your unfair and deceptive conduct caused members of the class to suffer similar economic harm each time they purchased a prescription of Neurontin. The economic loss stems directly from Pfizer's unfair or deceptive marketing, promotion and advertisement of the drug Neurontin.

We believe this demand identifies the Claimants, reasonably describes the unfair or deceptive acts or practices committed by you and/or your companies, and states the injury suffered. *See, e.g., Entrialgo v. Twin City Dodge, Inc.*, 368 Mass. 812, 813 (1975); *Baldassari v. Public Finance Trust*, 369 Mass. 33, 41-42 (1975); *York v. Sullivan*, 369 Mass. 157, 163 (1975); *Heller v. Silverbranch Const.Corp.*, 376 Mass. 621, 627 (1978); *Spring v. Geriatric Authority of Holyoke*, 394 Mass. 274, 287 (1985). Moreover, we believe this demand letter sufficiently provides you with "an opportunity to review the facts and the law involved to see if the requested relief should be granted or denied" and at a minimum enables you to extend "a reasonable tender of settlement." *Slaney v. Westwood Auto, Inc.*, 366 Mass. 688, 704 (1975). *See also Spring*, 394 Mass. at 288; *York*, 369 Mass. at 162-63.

## PUTATIVE CLASS REPRESENTATIVES AND THE CLASS

Claimant, Laura Allen, Aministratrix of the Estate of the late Daniel Allen, is a resident of the Commonwealth of Massachusetts whose late husband was prescribed Neurontin during the Class Period for the treatment of migraine headaches, loss of energy and Amyotrophic Lateral Sclerosis (Lou Gehrig's Disease). Such conditions were among the scientifically unproven uses of Neurontin that you wrongly promoted the drug for. As a result, Claimant has been injured by reason of the acts or practices alleged herein.

Claimant, Timothy Bridges, is a resident of the Commonwealth of Massachusetts who was prescribed Neurontin during the Class Period for treatment of pain syndromes, nerve pain and stroke-like symptoms. Such conditions were among the scientifically unproven uses of Neurontin that you wrongly promoted the drug for. As a result, Claimant has been injured by reason of the acts or practices alleged herein.

Claimant, Alfred Morabito, is a resident of the Commonwealth of Massachusetts who was prescribed Neurontin during the Class Period for treatment of arthritis, tremors and fibromyalgia. Such conditions were among the scientifically unproven uses of Neurontin that you wrongly promoted the drug for. As a result, Claimant has been injured by reason of the acts or practices alleged herein.

Claimant Scott M. Bernard is a resident of the Commonwealth of Massachusetts who was prescribed Neurontin during the Class Period as a drug therapy treatment for bipolar disorder, Attention Deficit Disorder and drug/alcohol withdrawal symptoms. Such conditions were among the scientifically unproven uses of Neurontin that you wrongly promoted the drug for. As a result, Claimant has been injured by reason of the acts or practices alleged herein.

Claimants make a claim against Pfizer individually and on behalf of all others similarly situated and injured.[3] *See* G.L. c. 93A § 9(2); *see also Aspinall*, 442 Mass. at 391, 402 (certifying under G.L. c. 93A a class of consumers alleged to have been subjected to misleading marketing). Claimants assert the claims exclusively under G.L. c. 93A, §§ 2 and 9(2), individually and on behalf of the following putative class:

> All resident Massachusetts consumers who purchased Neurontin for non-commercial and/or consumer purposes as prescribed for scientifically unproven uses between January 1, 1994 and the present.

Excluded from the Class are all claims for personal injury or wrongful death. Neither the Claimants nor any member of the class has damages exceeding $75,000 each even when trebled. Claimants state and intend to state a cause of action solely under the laws of Massachusetts and specifically disavow any attempt to state or rely upon a federal question and/or cause action under the laws of the United States.

Claimants and each member of the putative class sustained economic harm and/or the invasion of a legally protected right by Pfizer's use or employment of unfair or deceptive acts or practices, referred to herein, which have been declared unlawful and violative of M.G.L. c. 93A §§ 2 and 9. *See, e.g., Aspinall*, 442 Mass. at 400 (quoting *Leardi v. Brown*, 394 Mass. 151, 160 (1985)).

## UNFAIR OR DECEPTIVE ACTS OR PRACTICES

Pfizer violated G.L. c. 93A by engaging in knowing and willful, intentional and coordinated deceptive acts or practices to market and sell Neurontin to treat a multitude of medical conditions despite Pfizer's knowledge that there was no scientific basis to

---

[3] The Consumer Protection Act, M.G.L. c. 93A § 9(2) provides that: "[a]ny persons entitled to bring [an action under M.G.L. c. 93A § 9(1)] may, if the use or employment of the unfair or deceptive act or practice has caused similar injury to numerous other persons similarly situated and if the court finds in a preliminary hearing that he adequately and fairly represents such other persons, bring the action on behalf of himself and such other similarly injured and situated persons . . . ."

port such uses. The Supreme Judicial Court recently clarified the definition of "deceptive" for cases such as this.

> [A] practice is "deceptive," for purposes of G.L. c. 93A, if it could reasonably be found to have caused a person to act differently from the way he or she otherwise would have acted. In the same vein, we have stated that conduct is deceptive if it possesses a tendency to deceive. In determining whether an act or practice is deceptive, regard must be had, not to fine spun distinctions and arguments that may be made in excuse, but to the effect which the act or practice might reasonably be expected to have upon the general public.

*Aspinall*, 442 Mass. at 394 (internal marks and citations omitted).

Pfizer also violated G.L. c. 93A § 2(a) by engaging in a variety of other unfair or deceptive acts or practices in the conduct of trade or commerce, as identified by 940 C.M.R. §§ 3.00 et seq., regulations authorized by M.G.L. c. 93A § 2(c). These regulations have the force of law and "set standards the violations of which ... constitute violations of [G.L.] c. 93A." *Purity Supreme, Inc. v. Attorney Gen.*, 380 Mass. 762, 769-771 (1980). Per the terms of the regulations, the following activities constitute unlawful unfair or deceptive acts or practices that violate G.L. c. 93A § 2:

1. producing a statement in advertising which creates a false impression of the quality or utility of the product offered, or which may otherwise misrepresent the product, *see* 940 C.M.R. § 3.02(2);
2. stating a claim or representation "by any means concerning a product which directly, or by implication, or by failure to adequately disclose additional relevant information, has the capacity or tendency or effect of deceiving buyers or prospective buyers in any material respect . . . [including] representations or claims relating to the . . . reliability . . . or the utility of such product . . . or the benefit to be derived from the use thereof," *see* 940 C.M.R. § 3.05(1);
3. using advertisements "which would mislead or tend to mislead buyers or prospective buyers, through pictorial representations or in any other manner, as to the product being offered for sale," 940 C.M.R. § 3.05(2); *see also* 940 C.M.R. § 6.01 (defining "material representation"); 940 C.M.R. § 6.04(1) (defining "misleading representation").

Note that "940 CMR 3.00 is not intended to be all inclusive as to the types of activities declared unlawful by G.L. c. 93A, § 2(1) but are intended to be of general application." 940 C.M.R. § 3.00.

## A SAMPLING OF UNFAIR OR DECEPTIVE ACTS OR PRACTICES

With apparently utter disregard for the mentally ill, terminally ill and those in chronic pain, Pfizer promoted Neurontin for at least eleven (11) uses that lacked

_ly_ valid support, including the treatment of: bipolar disorder; pain syndromes, _ral_ neuropathy, and diabetic neuropathy; epilepsy as a monotherapy; Reflex _pathetic_ Dystrophy (RSD); Attention Deficit Disorder (ADD); Restless Leg _ndrome_ (RLS); trigeminal neuralgia; Amyotrophic Lateral Sclerosis (ALS, a _degenerative_ nerve disease commonly referred to as Lou Gehrig's Disease); essential tremor periodic limb movement; migraines; and drug and alcohol withdrawal seizures. In addition, in an effort to increase sales, Pfizer initiated an unfair or deceptive campaign to convince physicians to prescribe Neurontin in doses 33% greater than the accepted safety level. Pfizer abandoned any semblance of ethical behavior and adopted an unfair or deceptive pattern of marketing based on half-truths, misrepresentations and worse. Your quest for an unattainable sales volume and its related profits fueled and sustained your descent into marketing Neurontin almost exclusively by unfair or deceptive acts or practices are violative of G.L. c. 93A.

All members of the putative class of Massachusetts Neurontin purchasers were economically injured. All purchased a product that was not equal in value to the price charged, a product which was deceptively marketed by you. Claimants believe that your unfair or deceptive marketing acts or practices were intentional, willful and were meant to deceive. All class members will be entitled at a minimum to statutory damages. _See_ G.L. c. 93A § 9(3); _Aspinall, supra._

This class wide claim brought on behalf of similarly situated and similarly injured Massachusetts consumers arises from unfair and/or deceptive conduct in your promotion of uses for Neurontin that lacked sufficient scientifically valid support. In addition to the lack of scientifically valid support, your marketing violated industry ethical standards and the representations you made to Massachusetts physicians and the consuming public was unfair and deceptive. While we take the time to list several of your unfair acts and practices understand they are only examples. The list of individual instances of your unfair and deceptive practices is voluminous and you retain exclusive possession and control of many details. As such, Pfizer willfully and knowingly utilized an unfair or deceptive scheme of acts and practices to achieve the high sales volume and profit goals it set for Neurontin, including, but not limited to the following:

1. Pfizer encouraged sales representatives to provide improper one-on-one sales pitches to physicians, about uses of Neurontin for purposes having no scientifically valid support;

2. Pfizer published or caused to be published articles, studies and reports that misrepresenting the scientific credibility of the data and the authors of the articles, studies and reports;

3. Pfizer permitted its agents to make false or misleading statements to health care professionals about the drug's safety, efficacy, effectiveness and usefulness;

4. Pfizer utilized "medical liaisons," to promote select uses of Neurontin that had no scientifically valid support. Further, these liaisons represented themselves (often falsely) as scientific experts;

5. Pfizer paid doctors to attend "consultants' meetings." Despite the fact that Pfizer allegedly hired these physicians to provide consultations at the meetings, Pfizer did not use the information gathered if any, and after appearing the attendees were asked to provide little or no significant consulting. Rather, the doctors attending were directed in the alternative to expensive dinners or conferences at luxurious locations, during which Pfizer's agents made presentations about uses of Neurontin for purposes having no scientifically valid support. These so-called medical liaison "meetings" included extravagant weekends and trips to Florida, the 1996 Atlanta Olympics, and Hawaii;

6. Pfizer instructed its sales representatives to recruit physicians to call into teleconferences and listen to a doctor or Pfizer employee lecture on select uses of Neurontin. Those select uses involved purposes having no scientifically valid support;

7. Pfizer also sponsored events they misrepresented to be "independent medical education" events, focusing on uses of Neurontin having no scientifically valid support. During these "independent medical education" its employees or agents would exercise extensive control over the topics, speakers, content, and participants but deceptively did not disclose this fact to attendees. On at least one occasion, when a speaker at a deceptively self styled "independent medical education" event posited unfavorable remarks about Neurontin, Pfizer knowingly, willfully, unfairly and deceptively offset the negative impact by then planting its agents and/or employees in the audience to ask questions that would highlight the drug's illusory benefits;

8. Using unfair and deceptive misrepresentations as a lead in, Pfizer paid physicians to allow sales representatives to be present during the examination of patients. The sales representatives would deceptively offer biased advice regarding the patient's treatment in order to advance uses of Neurontin for purposes having no scientifically valid support; and

9. Pfizer intentionally misrepresented and concealed their role in the creation and sponsorship of a variety of seminars, events, articles and publications aimed to sell Neurontin for purposes with no scientific, medical and clinical data related to safety, efficacy, effectiveness and usefulness.

The misrepresented uses for Neurontin and the unfair or deceptive promotional tactics were implemented as part of a coordinated marketing plan to turn the Neurontin into a "blockbuster" despite the fact that standing on its own scientifically supported uses "blockbuster" status could never be reached. A "blockbuster" is any drug that sold $1

billion per year or more. Neurontin earned $1.3 billion in 2000 and $1.7 billion in 2001 with more than 78% of prescription written for uses with no scientific, medical and clinical data.

On information and belief, over 700 articles were published in medical literature on Neurontin during the putative class period. Many of these articles employ results obtained from company-contrived studies on uses of Neurontin for purposes having no scientifically valid support.

Pfizer designed, expanded and perpetuated their promotion of uses of Neurontin for purposes having no scientifically valid support. This unfair or deceptive marketing scheme was not for the benefit of Massachusetts consumers or enhanced comfort of patients, but solely for the purpose of meeting marketing goals. Underscoring this fact, and as summed up best by a senior Pfizer marketing executive during a teleconference with a medical liaison:

"I want you out there every day selling Neurontin. Look this isn't just me, it's come down from Morris Plains that Neurontin is more profitable. We all know Neurontin's not growing as an adjunctive therapy, beside that is not where the money is. Pain management, now that's money. Monotherapy, that's money. We don't want to share these patients with everybody; we want them on Neurontin only. We want their whole drug budget, not a quarter, not half, the whole thing . . . . We can't wait for them to ask, we need to get out there and tell them up front . . . That's where we need to be holding their hand and whispering in their ear Neurontin for pain, Neurontin for monotherapy, Neurontin for bipolar, Neurontin for everything . . . I don't want to see a single patient coming off Neurontin until they have been up to at least 4800 mg/day, I don't want to hear that safety crap either, have you tried Neurontin, every one of you should take one just to see there is nothing, it's a great drug."

Other examples of Pfizer's unfair or deceptive scheme include, but are not limited to:

1.    Instructing employees to deliberately contrive reports to mislead physicians into believing that a body of data existed that demonstrated the effectiveness of Neurontin in the treatment of unproven uses such as bipolar disease. In fact, no data existed at all to support such uses;

2.    Instructing employees to actively deceive physicians with contrived data, falsified "leaks" from clinical trials, scientifically flawed reports, or "success stories" that stated that Neurontin was highly effective in the treatment of a variety of uses including pain syndromes. No such body of evidence existed;

3.    Instructing employees to advise physicians that Pfizer had developed a large body of data to support the use of Neurontin as monotherapy. This was an "outright lie" and left patients unknowingly without good seizure context.

4.    Instructing employees to advise physicians that a great deal of data existed that supported the safe use of Neurontin at levels that exceed 4800 mg/day. However, clinically significant safety data existed at dosing levels at only 1800 mg/day.

5.    Providing medical liaisons with slides that stated that Neurontin was effective for the treatment of Attention Deficit Disorders when no data existed to support that claim.

In willfully and knowingly carrying out unfair or deceptive acts or practices, you fraudulently, effectively, and affirmatively concealed you scheme from the Claimants and the putative Massachusetts class. Although Claimants exercised due diligence during the Class Period by promptly investigating the facts giving rise to the claims asserted herein, Claimants did not discover your wrongful conduct until at the earliest May 2002 when the federal court file in the Franklin *qui tam* case was completely unsealed. Your fraudulent concealment also constitutes a separate and distinct violation of the Massachusetts Consumer Protection statute. The putative class asserts that as a result of your fraudulent concealment, the statute of limitations has been tolled.[4]

Claimants allegations of unfair or deceptive acts or practices are meritorious as well as your knowledge of the unfair or deceptive acts or practices for which the Claimants lodge complaint and demand compensation. This is evidenced by the fact that on May 13, 2004, you agreed to plead guilty to criminal allegations in connection with illegal and fraudulent promotion of unapproved uses for Neurontin.

## SIMILAR INJURY SUFFERED BY ALL CLASS MEMBERS UNDER G.L. C. 93A

Respondents' willful and knowing, unfair or deceptive acts or practices described herein have caused similar economic injury and damages to Claimants. Each Claimant and class member suffered a similar economic injury and/or the similar invasion of a legally protected interest as a result of your unfair and/or deceptive promotion of Neurontin to treat a variety of symptoms for which Neurontin was not proven to be safe, efficacious, effective or useful. First, with regard to the economic injury, all class members paid the purchase price of Neurontin, including but not limited to prescription co-payments, which they would not have paid had they known about Pfizer's profuse misrepresentations. Second, with regard to the invasion of a legally protected interest, all class members have a right to participate in the marketplace, free from unfair or deceptive acts or practices and from being intentionally deceived. *See Aspinall*, 442 Mass. at 394; G.L. c. 93A § 2.

---

[4] The applicable statute of limitations for violations of the Consumer Protection Act, M.G.L. c. 93A, is four (4) years. *See* M.G.L. c. 260 § 5A. However, the statute of limitations is tolled when a defendant fraudulently conceals wrongful conduct from the injured plaintiff(s). *See* M.G.L. c. 260 § 12 ("If a person liable to a personal action fraudulently conceals the cause of such action from the knowledge of the person entitled to bring it, the period prior to the discovery of his cause of action by the person so entitled shall be excluded in determining the time limited for the commencement of the action."); *see also Ciardi v. Hoffmann-LaRoche, LTD*, 2000 WL 33162197, at *9 (Mass. Super. Sept. 29, 2000) (Botsford, J.).

Be clear that under Massachusetts law, product marketing through intentionally false representations constitutes, in and of itself, an ascertainable injury under G.L. c. 93A. *See Aspinall*, 442 Mass. at 394; *Leardi*, 394 Mass. at 158-60; *Slaney*, 366 Mass. at 703. In your offer of settlement you should seriously consider the related law of the Commonwealth of Massachusetts under which you will be judged and held accountable. Pfizer knowingly and willingly promoted Neurontin to Massachusetts consumers for unproven uses to vulnerable consumers because they represented a highly profitable target market. These vulnerable consumers sustained similar economic injury as a result of your unfair or deceptive representations of Neurontin as safe and effective for uses and purposes having no scientifically valid support.

## **DEMAND FOR RELIEF**

The above-named Claimants, individually and on behalf of others similarly situated, hereby demand that Pfizer:

1. Tender a reasonable offer of written settlement within thirty (30) days;
2. Pay restitution and refunds to Claimants and members of the putative class for all sums paid by them to purchase Neurontin to treat a variety of symptoms for which Neurontin was not proven to be safe, efficacious, effective or useful; or
3. Pay restitution and refunds to Claimants and the putative class in the amount of twenty-five dollars a person as allowed under G.L. c. 93A, § 9(3); and
4. Reimburse Claimants and members of the proposed class for their reasonable attorney's fees and expenses incurred in asserting this claim.

Claimants also demand, pursuant to G.L. 93A that you respond directly to the following inquiries:

1. Please state in writing whether you are interested in entering settlement discussions with Claimants and the putative class of Massachusetts consumers;
2. If yes, please provide the first date you promoted Neurontin to treat a variety of symptoms for which Neurontin was not proven to be safe, efficacious, effective or useful and for the dates of all related unfair or deceptive marketing campaigns including the so-called ghost writing work leading up to active marketing efforts for the sale of Neurontin for scientifically unproven uses;
3. If yes, please provide the number of prescriptions for Neurontin written in the Commonwealth of Massachusetts to treat the variety of symptoms for which Neurontin was not proven to be safe, efficacious, effective or useful and the number of known patients in the Commonwealth of Massachusetts that were prescribed Neurontin for conditions where the scientific, medical and clinical data were misrepresented;
4. If yes, please provide the nature and extent of damages to which you calculate were sustained by the Massachusetts class; and

5. Please provide appropriate measure of damages for those you are willing to offer.

Claimants are willing to enter into a protective order and request that you agree to produce the above-requested information.

Please be advised that you have (30) days to make a reasonable offer of relief. If you fail to make a reasonable offer and your conduct is found to be unfair or deceptive, Claimants and the class will be awarded their damages and attorney's fees. Further, if the Court determines that your conduct was willfully and knowingly unfair or deceptive the Court must award the Claimants and the class up to three times, but not less than two times, their actual damages.

Sincerely,

Robert J. Bonsignore, Esquire

RJB/jl

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

LAURA ALLEN, Administratrix, TIMOTHY BRIDGES, and ALFRED MORABITO

## DEFENDANTS

PFIZER INC. and PARKE-DAVIS, Division of Warner-Lambert Company

**05-10797 PBS**

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF   UNKNOWN
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   N/A
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED.

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Robert J. Bonsignore, Esq.
Bonsignore & Brewer
23 Forest St., Medford, MA 02155
(781) 391-9400

ATTORNEYS (IF KNOWN)
David B. Chaffin, Esq.
Hare & Chaffin
160 Federal St., Boston, MA 02110
(617) 330-5000

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 2 U.S. Government
Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 4 Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
AND ONE BOX FOR DEFENDANT)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☐ 1 Original
Proceeding

☒ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## V. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☐ 810 Selective Service |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | | | | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| | | | | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | | |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS — Third Party 26 USC 7609 | ☒ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## VI. CAUSE OF ACTION
(CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE.
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Class Action under Mass. Gen. L. ch. 93A arising out of marketing and sale of Neurontin

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ In excess of $5 Million

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ YES   ☒ NO

## VIII. RELATED CASE(S) IF ANY (See instructions):

JUDGE   Saris

DOCKET NUMBER   04-10981

DATE   4.20.05

SIGNATURE OF ATTORNEY OF RECORD

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only)    LAURA ALLEN v. PFIZER INC.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet.  (See local rule 40.1(a)(1)).

- [ ] I.    160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

- [X] II.   195, 196, 368, 400, 440, 441-446, 540, 550, 555, 625, 710, 720, 730,    *Also complete AO 120 or AO 121
          740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.           for patent, trademark or copyright cases

- [ ] III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
          315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
          380, 385, 450, 891.

- [ ] IV.   220, 422, 423, 430, 460, 480, 490, 610, 620, 630, 640, 650, 660,
          690, 810, 861-865, 870, 871, 875, 900.

- [ ] V.    150, 152, 153.

05 - 10797 PBS

3. Title and number, if any, of related cases. (See local rule 40.1(g)).  If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

In re Neurontin Marketing and Sales Practices Litigation, MDL No. 1629;
Master Docket No. 04-10981-PBS

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES [ ]    NO [X]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?  (See 28 USC §2403)

YES [ ]    NO [X]

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES [ ]    NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES [ ]    NO [X]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES [ ]    NO [ ]    Unknown

A.    If yes, in which division do all of the non-governmental parties reside?

Eastern Division [ ]    Central Division [ ]    Western Division [ ]

B.    If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division [ ]    Central Division [ ]    Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES [ ]    NO [X]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME    David B. Chaffin

ADDRESS    Hare & Chaffin, 160 Federal St., Boston, MA 02110

TELEPHONE NO.    (617) 330-5000

(CategoryForm.wpd - 2/15/05)